Harvey Stoeckman, Administrator, Appellant, *v.* Terre Haute and Indianapolis Railroad Company, Respondent.

May 27, 1884.

1. Practice — Bills of Exceptions. — The respondent may, under the rule, take up his bill of exceptions setting out the evidence in full, where the appellant's record states that evidence tending to prove the issue was introduced, and where the question as to the sufficiency of the evidence is raised, the two bills will be considered together.

2. Foreign Statutes. — The statute of another state will be enforced in this state, where the policy of the two statutes upon the subject of the right of action is the same.

3. —— Negligence. — A statute of another state which gives a right of action to the personal representatives of the deceased against the person through whose wrongful act or default the death occurred, will be enforced in this state.

4. —— An action for damages for the death of a person, caused by the wrongful act or default of another, is remedial, not penal.

5. —— Administration. — Money recovered in such an action is not general assets of the estate, and may be recovered by the administrator in Missouri, where the deceased resided at the time of his death.

6. Master and Servant — Negligence. — A servant assumes the risk of patent defects in machinery upon which he is employed to work.

7. —— Evidence — Practice. — The burden is upon the defendant to show that the defect was latent, and not open to ordinary observation, where he has been constantly employed upon it for several days.

8. ——Res Gestæ. — A declaration of the deceased, as to the cause of the injury made at the time and place thereof, is admissible as a part of the *res gestæ*, in an action for damages for the death.

Appeal from the St. Louis Circuit Court, Barclay, J. *Affirmed*.

M. F. Taylor, for the appellant.

Pattison & Crane, for the respondent.

Thompson, J., delivered the opinion of the court.

This was an action brought by an administrator appointed in Missouri for damages resulting in the death of his intestate, which took place in the state of Illinois.

At the close of the testimony, the court instructed the jury that the plaintiff was not entitled to recover. The plaintiff took a bill of exceptions which states that this instruction was given by the court with the accompanying announcement to counsel, that the action of the court was based upon the fact that, as the statute of Illinois gave a right of recovery to the personal representative, and the Missouri statute of similar import gave a right of recovery to the next of kin of the deceased suing in person, the Illinois statute could not be enforced in the courts of Missouri. This bill of exceptions also states that the plaintiff offered evidence tending to support all the allegations of his petition.

The respondent, for the purpose of bringing under review the merits of the case, has taken a bill of exceptions presenting the evidence and ending with the following recital : "And, as the court is of opinion that the above evidence tends to prove the facts alleged by plaintiff in his petition, and has signed plaintiff's bill of exceptions stating that there was evidence to prove the allegations of said petition, defendant excepts to the opinion of the court that the above evidence tends to prove the allegations of said petition, and tenders this, its bill of exceptions, and asks that the

same may be signed and sealed as such, which is accordingly done."

I. The appellant makes the preliminary question that this bill of exceptions can not be considered at all, and his contention is that, the decision of the court having been in the respondent's favor, the court here can not inquire into, or be concerned with, the reasons which influenced that decision; and that it is absurd and incongruous for a party in whose favor the whole case has been decided, and who is the respondent in an appeal from such decision, to present himself in the appellate court as an exceptor. This contention, it must be conceded, conforms, in strict logic, to the principles of appellate procedure in actions at law; but, like other rules which are strictly logical, it has been found necessary, in order to prevent the multiplying of appeals and new trials, and to bring the whole case under review before the appellate court, that it should give way to rules of practical convenience. Such rules were prescribed a few years since by the supreme court, with reference to the subject under consideration, and were adopted by this court soon after its organization. These rules are as follows :—

1. " In actions at law it shall not be necessary, for the purpose of reviewing in this court the action of any circuit court, or any other court having by statute jurisdiction of civil cases, in giving or refusing instructions, that the whole of the testimony given or excluded at the trial in the court of first instance should be embodied in the bill of exceptions; but it shall be sufficient, for the purposes of such review, that the bill of exceptions should state that ' evidence tending to prove ' a particular fact or issue was given, and that an exception was saved to the giving or refusing of instructions founded on it.

2. " If the opposite party shall contend that there was no evidence tending to prove a fact or issue, and the court of first instance shall be of opinion that there was such evidence, it shall be the duty of the court to allow the bill of

exceptions in the form stated in the last preceding rule, and then the other party shall be at liberty to set out in a bill of exceptions, to be prepared by him, the whole of the testimony supposed to be applicable to such fact or issue, and to except to the opinion of the court that the same tends to prove such fact or issue.''

The case before us seems to fall within the purview of the second rule above quoted; and we therefore hold that the respondent's bill of exceptions is to be considered.

II. The next question is whether the plaintiff, being an administrator appointed in the state of Missouri, is entitled to prosecute this action under the statute of the state of Illinois, for damages for the death of his inte state, which took place in that state, in which state the defendant owned and operated a railroad. The right of recovery is predicated upon a statute of Illinois which the plaintiff has pleaded and proved, as follows : —

'' Be it enacted by the people of Illinois, represented in the general assembly : —

'' Section 1. Whenever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect, or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or company or corporation which would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured; and although the death shall have been caused under such circumstances as amount in law to a felony.

'' Sect. 2. Every such action shall be brought by and in the name of the personal representative of such deceased person ; and the amount recovered in every such action shall be for the exclusive benefit of the widow and next of kin of such deceased person, and shall be distributed to such widow and next of kin in the proportion provided by law in

relation to the distribution of personal property by persons dying intestate ; and in every such action the jury may give such damages as they shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such death to the wife and next of kin of such deceased person, not exceeding the sum of $5,000 ; provided, that every such action shall be commenced within two years after the death of such person.''

At common law, no action lay for injuries resulting in the death of a human being.   Such an action was first given in England by a statute known as Lord Campbell's act.   9 & 10 Vict., ch. 93.   This statute has been, with various modifications, incorporated into the legislation, it is believed, of all the American states.   Under these statutes the question has frequently arisen in the American courts, whether, in the case where the death of a human being has happened in one state, under such circumstances as would give a civil action therefor, under the statute of that state, such action can be maintained in the courts of another state ; in other words, whether any extra-territorial force can be given to statutes of this kind.   A majority of these courts seem to have reached the conclusion that the remedy under such a statute is confined to the courts of the state in which the injury took place. — *Whitford* v. *Panama R. Co.*, 23 N. Y. 465, affirming *s. c.* 3 Bosw. 67 ; *Vandeventer* v. *New York, etc., R. Co.*, 27 Barb. 244 ; *Beach* v. *Bay State, etc., Co.*, 10 Abb. Pr. 71 ; *s. c.* 30 Barb. 433, reversing 27 Barb. 248 ; 6 Abb. Pr. 415 ; *Vanderworken* v. *New York, etc., R. Co.*, 6 Abb. Pr. 239 ; *Campbell* v. *Rogers*, 2 Handy, 110 ; *Hover* v. *Pennsylvania R. Co.*, 25 Ohio St. 667 ; *Nashville, etc., R. Co.* v. *Eakin*, 6 Coldw. 582 ; *Woodward* v. *Michigan Southern R. Co.*, 10 Ohio St. 121 ; *Richardson* v. *New York Central R. Co.*, 98 Mass. 85 ; *McCarthy* v. *Chicago, etc., R. Co.*, 18 Kan. 46.   The contrary rule has been declared in some jurisdictions, notably in the supreme court of the United States, and in the court of appeals of New York,

in late cases. *Dennick* v. *Railroad Co.*, 103 U. S. 11; *Leonard* v. *Columbia Steam Nav. Co.*, 84 N. Y. 48. In the former of these last two cases, Mr. Justice Miller, in delivering the unanimous opinion of the supreme court of the United States, answers, and conclusively, we think, every position taken by the learned counsel for the defendant in support of the ruling of the circuit court in the case before us. The question there was, whether a right of action for damages resulting in death, given by the statute of New Jersey, in which state the injury took place, could be maintained in a court in New York by an administrator appointed in New York. The New Jersey statute is a precise transcript of the Illinois statute under which the present action is brought. It was held that such an action could be maintained. In the case last cited, the New York court of appeals, reviewing, distinguishing, and perhaps to some extent, overruling a number of prior decisions of that and other courts of the same state, upon the same question, held that such an action can be maintained in New York, where the statute of the sister state sued upon is of the same general character as the statute of New York upon the same subject. And the court are careful to say that it is not necessary that the foreign statute should resemble the New York statute in all its details. It is sufficient that the policy of the legislation of two states upon the subject of the right of action for such an injury is the same.

These very recent decisions of two of the most authoritative courts of the union indicate the tendency of recent judicial sentiment on the question. Not only this, but the well reasoned opinions delivered in each of these cases point out the fallacy of the grounds on which courts which have reached the contrary conclusion have proceeded.

It has been supposed that these statutes ought to have no extra-territorial force, because they create rights of action

which did not exist at common law. But this reasoning proves quite too much, because authorities are abundant to show that the courts are in the constant habit of enforcing rights of action, transitory in their nature, which are created by the statute laws of other states of the union.

Neither is it an objection which can be listened to that such an action is penal in its character, and that the case is, hence, within the rule upon which courts proceed when they refuse to enforce the penal statutes of other states. The statute before us is in no sense a penal statute. It is in the fullest sense a remedial statute. It extends no further than to give to those that have suffered a pecuniary loss through the wrongful killing of a human being a right of action to recover compensation for that loss. It is well known that the supreme court of Illinois has limited the amount of damages which can be recovered under the statute to mere compensation for the pecuniary loss sustained. Nothing is is given as a *solatium;* and the damages sustained must be specially proved.

Neither is there any fundamental difference between the statute of Missouri giving a right of action in such a case and that of Illinois. Our statute, it is true, differs from the statute of Illinois in several matters of detail, and also in the measure of damages. Our statute gives the right of action to certain near relatives of the deceased suing directly in their own behalf. The Illinois statute gives the same right to the widow and next of kin of the deceased, suing through his personal representative as their statutory trustee; for whatever he recovers is for their use, and is not subject to general administration. In respect of the measure of damages, our statute is penal, while that of Illinois is remedial; because our statute gives the right to recover the penalty or liquidated sum of $5,000, irrespective of any question of actual pecuniary loss, whereas the Illinois statute gives compensation for the actual pecuniary loss

merely. It thus appears that our legislation upon this subject is founded upon the same general policy as that of Illinois; and it follows that there can be no reason of public policy which should forbid our courts to entertain an action under the Illinois statute, unless there is some insuperable obstacle which prevents our courts from affording a complete remedy.

Is there any such obstacle? Is it possible that, when a person suing in a representative character recovers a sum of money in virtue of a right given by a statute of another state, which says that the sum of money so recovered shall be for the use of certain persons, he will not be allowed by our courts to distribute the money to the persons for whose use it was recovered? It would be a reproach upon our laws to say so. The fund recovered in such an action as this, by a Missouri administrator, is not assets of the deceased. It does not go into general administration for distribution, to creditors first, and then to the next of kin, under our statute. He holds the money recovered as a statutory trustee, subject to a trust impressed upon it by the statute of the sister state which created the right of action; and not only will our courts not prevent the execution of such a trust, but there is not the least question that they would, in a proper case, enforce its execution. The moneys so recovered could, in no possible view of the case, be regarded as assets of the deceased person. They did not belong to his estate while living, or constitute an indebtedness to his estate; and neither the statute of this state nor that of Illinois makes them assets of the decedent's estate. They belong to the widow and next of kin, according to the Illinois statute of distribution; and our courts can, if necessary, compel their distribution to such widow and next of kin as easily as they can enforce a trust created by a will made in another state by a person there dying.

But it is argued that the legislature of Illinois could not

have intended to give such a right 'of action to a foreign administrator — to an administrator appointed in a state other than the state of Illinois. It is argued that the words "personal representative," in the Illinois statute, must be limited in their meaning to an executor or an administrator appointed in that state. Why should we so hold? The statute does not say so. If the domicil of the deceased person was in Missouri; if his general estate is here, why should it be held necessary for his next of kin to cause ancillary administration to be taken out in Illinois, and to go to the expense of prosecuting an action there, at a place distant, it may be, from their own domicil? This whole branch of the argument proceeds in the very face of the statute. It says that the action shall be brought by the personal representative of the deceased ; the plaintiff is that personal representative, and yet the contention is that he shall not be allowed to maintain the action.

The question is now, we believe, presented for the first time in this state. The decisions upon the question in other states are shown to be conflicting. These statutes are of recent origin. The question of their extra-territorial force has presented itself to various courts of the union as a question of first impression ; and, reasoning on various grounds, for the most part of a technical nature, they have arrived at different conclusions. In this conflict of authority we are quite at liberty to adopt the view which seems best to consist with the policy of our legislation, and with that spirit of comity which ought to subsist between different states of the union. We accordingly hold that this action was well brought.

III. But if, upon the whole record, it appear that there was no evidence of negligence, while disagreeing with the learned judge in his opinion that the plaintiff had no legal capacity to sue, it will become our duty to affirm his ruling in refusing to set aside the non-suit.

The plaintiff introduced evidence tending to show that the defendant was a railway company operating a railway in the state of Illinois, and having, at East St. Louis, in Illinois, what is called a " yard " in the language of railroad men ; that is, a number of parallel tracks or sidings used for the standing of cars, for switching them from the main track or tracks, and for making up and separating trains. The deceased was a lad about eighteen years of age, who had lived in the city of St. Louis ; the plaintiff, who now sues as administrator, was his brother-in-law, having married his eldest sister. The lad, it seems, was ambitious to make a living, and accordingly he had conceived the idea of engaging in railroading, and had taken lessons in coupling cars at the elevator in East St. Louis until he thought himself competent to do that kind of work. The plaintiff, who had been for thirteen years a railroad man, and who was at the time engaged in the defendant's yard in East St. Louis, seems to have shared with the deceased this opinion ; and, accordingly, the plaintiff solicited and procured for him an appointment as " helper " on a switch engine in the defendant's yard at $2 per day, the same being the wages which the defendant was then paying to experienced workmen who were engaged in the same service. The crew of a switch engine regularly consists of four men : the engineer, the fireman, and two helpers. The engineer and fireman, of course, remain on the engine and have charge of it ; the helpers, as we infer, run back and forth, move switches, and couple and uncouple, and brake cars. Their duties are such that they are frequently required to ride on the pilot of the engine, and to get on and off the engine, both while it is at rest and while it is in motion. In order that they may do this with safety, every regularly built switch engine has in front of it a plank platform about a foot wide, upon which they may stand, and a horizontal rod called a handrail, which they may hold on to, and which they may take hold of in getting on and off. The engine upon which the

deceased was employed as a helper was designated as " 157." It was not a regularly built switch engine; it was an ordinary locomotive engine, having in front, instead of the platform already spoken of, a " pilot" or " cow-catcher," the general appearance of which the witnesses attempted to describe in their rude way, without making more clear what is familiar to every one. There was no horizontal rod on this engine which the helper could take hold of in getting on and off the pilot; but there was at the front end of the engine and on each side, as we infer from the testimony, an iron or brass flag staff, which, we take it, a person could take hold of in getting on or off the pilot, though the evidence on this point does not create a very distinct impression. The inconvenience in getting on and off the pilot was such that, a few days before the accident, three of the men employed about this engine, one of whom was the deceased, had, of their own accord, constructed and fastened in some way to the pilot, a temporary platform on which the helpers could stand in performing their duties. This, it seems, had not worked well, or had been found objectionable; for it had been removed by the defendant and replaced by a different structure some three days before the accident. This structure, as nearly as we can gather from the testimony, possessed the general features of a plank, passing in some way through and behind the pilot at its base or rear part, and extending out on each side so as to afford some foothold; and also two other planks extending along the bottom of the pilot and uniting at its apex, so as to extend beyond the lower edge of the pilot about eight inches, furnishing to that extent a foothold to the helpers in getting on and off. The evidence indicates that this new contrivance was not firmly fixed to the pilot. One witness, who was employed on the engine at the time of the accident, testified that, " they, the planks, were rather shaky — loose."

No witness testified at the trial who saw the accident.

The plaintiff saw the deceased about seven o'clock in the morning going to his work.   The plaintiff next saw him about half an hour later, lying by the side of one of the tracks with both his legs badly mangled.   Another witness was about seventy-five feet from him when the accident happened.   He does not describe how it happened.   The only evidence tending to connect the defective condition of the engine with the accident was a statement made by the deceased to the plaintiff when the plaintiff came up to him after the accident where he was lying on the side of the track before he had been removed.   The plaintiff thinks this may have been half an hour after the accident.   It was about half an hour after the plaintiff saw him going to his work.   The testimony of another witness, as to the time of the accident,would indicate that it may not have been so long a time.   The plaintiff testified: " I asked him how it happened.   He told me when he stepped on the foot-board one end of it was loose, and it tipped up with him, and let him fall off, or slip off rather.''   This was all the evidence tending to connect the condition of the engine with the accident.

Whether there was in this testimony evidence of negligence to go to the jury may depend upon the answer which is to be made to an intermediate question, whether this declaration of the deceased was admissible in evidence as a part of the *res gestæ*.   The rule upon this subject has been pretty clearly drawn by the decisions of our supreme court. It is, that the rule which permits dying declarations ·as such to be given in evidence applies exclusively to criminal prosecutions for felonious homicides, and has no operation in civil cases.   But in suits of the latter description, the declarations of dying persons are sometimes admitted on a different principle.   Thus, such a declaration in regard to the cause of death, when it grows out of and is made immediately after the happening of a fatal event, is admissible

as constituting a part of the *res gestœ*. *Brownell* v. *Pacific R. Co.*, 47 Mo. 239 ; *Entwhistle* v. *Feighner*, 60 Mo. 214.

Nor is it necessary in all cases that the declarations, in order to be admissible, should have been made contemporaneously with or immediately succeeding the event. It is sufficient that there were connecting circumstances between the declarations and the event, such that, although made sometime afterwards, they may be regarded, not as historical narratives, but as verbal acts forming a part of one transaction. Upon this point our supreme court has cited and followed *Insurance Co.* v. *Moseley*, 8 Wall. 397 ; and has applied the rule with such latitude that, in one case where the testimony tended to show that the plaintiff was injured about noon, her statements, made to her physician between 1 and 4 o'clock in the afternoon, as to how the injury happened, were held admissible. *Harriman* v· *Stowe*, 57 Mo. 93, 95. We conclude, then, that the learned judge committed no error in admitting the declaration of the deceased in this case. It seems that he lay, at the time, by the side of the track, at the immediate place where he had been injured ; that, though a crowd had gathered around him, there had not been time to remove him to his boarding-house. To such a case, the language of Mr. Justice Swayne, in *Insurance Co.* v. *Moseley* (*supra*), may fairly be applied : " In the ordinary concerns of life no one would doubt the truth of these declarations or hesitate to regard them, uncontradicted, as conclusive. Their probative force would not be questioned. Unlike much other evidence, equally cogent for all the purposes of moral conviction, they have the sanction of law as well as of reason."

We are of opinion, however, that these declarations do not sufficiently connect the cause of the injury with any such failure of duty on the part of the defendant as to constitute evidence of negligence to go to a jury. It must be

held, in conformity with well understood principles, that
if a master furnishes for the use of his servants a machine
not of the safest pattern or construction for the use in-
tended, and the servant, being familiar with the nature of
the machine and of the employment, consents to work with
such a machine, the defects being patent and well known
to him, or capable of being discovered by such an inspec-
tion as ordinary prudence and ordinary skill in his depart-
ment of service would dictate, he is held in law to take
upon himself the risks of injury from any such patent de-
fects in the machine, and, if injured in consequence of
them, no damages can be recovered of his master. *Nolan*
v. *Shickle*, 3 Mo. App. 300; *Cummings* v. *Collins*, 61 Mo.
520; *Porter* v. *Hannibal, etc., R. Co.*, 71 Mo. 66; *Smith*
v. *St. Louis, etc., R. Co.* 69 Mo. 32. We think it may be
said, in conformity with a principle equally well settled,
that, where the master undertakes to repair any deficiency
of the machine, the law will imply a representation on his
part to the servant that the master has exercised reasona-
ble care to make the reparation safe and secure, in so far
as it is apparently safe and secure. But there is no such
implied representation on the part of the master to the
servant except as to the latent defects; as to these, the
master impliedly represents to the servant that he has used
reasonable care and skill to eliminate them from the machine.
A master is under an affirmative duty to the servant to use
reasonable care and skill to the end that this be done, and
the servant is entitled to rely upon this implied representa-
tion of the master that reasonable care has been taken to the
end that it has been done; he " has a right to assume that
the machinery or implements furnished him by the em-
ployer are safe and suitable for the business, and he is not,
while the master is, required to examine them for that pur-
pose. The master is chargeable with knowledge which he
might have acquired with due care, the same as if he ac-

tually possessed it; whereas, the servant has the right to assume that the necessary examinations have been made by the master, and is not required, either in person or by another employed by him for the purpose, to examine the machinery as to its fitness or sufficiency." *Porter* v. *Hannibal, etc., R. Co.*, 71 Mo. 66, 79. "If, however, the defect is patent, open to observation, or such as the ordinary use of the machine in the business the servant is engaged in would disclose to an ordinarily observant man operating it, and the servant had ample opportunity, by operating it, before being injured, to observe the defect, his opportunity to know would be held as knowledge, whether in fact he knew of the defect or not." *Ibid.* 77.

Applying this principle to the case before us, it must be borne in mind that negligence is not to be presumed ; that the burden rested upon the plaintiff to show affirmatively some negligence on the part of the defendant which resulted in the death of the deceased. In conformity with this principle, it is clear that the mere facts that the engine was not a regularly built switch engine, that it did not have a regularly built platform for helpers to stand upon, or a hand rail for them to take hold of, furnished no evidence of negligence on the part of the defendant ; because these were all patent defects, of such a nature that when the deceased entered the employment of the defendant he took upon himself the risk of injury from them. It is also perceived that there is no evidence which speaks expressly on the point whether the loose condition of the platform which the defendant had improvised around the pilot for the men to stand upon was or was not apparent to ordinary observation. If it was not — if it is to be placed in the category of latent defects — the burden was upon the plaintiff to show that fact. Moreover, it appears that since this temporary platform had been constructed the deceased had been constantly working about the engine, in an employment

which required him to get constantly on and off this platform. An inference, therefore, arises from the evidence, that he knew of its patent deficiencies, so far as they were open to ordinary observation; and there is nothing whatever in the evidence which negatives this inference. There is no evidence whatever that the tipping up of the plank which, according to the declaration of the deceased above quoted, was the cause of his fall, was due to any giving way of its fastenings, or to any other cause than the manner in which it had been constructed, which manner is expressed in the words of the deceased, that "one end of it was loose," and in the words of a witness, that "they (the planks) were rather shaky — loose." In the absence of any evidence whatever tending to show the contrary, offered by the party having the burden of proof, the presumption is that this loose and shaky condition of the planks was open to observation, and that the deceased knew it. In continuing to work about an engine thus constructed or repaired he must, therefore, be taken to have assumed the risk of injury from such loose or shaky condition of the platform; and although the injury may have happened to him from this cause, the defendant is not liable for it.

We are, therefore, of opinion that the direction that the plaintiff was not entitled to recover was right, although not for the reason upon which the learned judge, of the circuit court proceeded. We hold that the plaintiff had legal capacity to sue, but that there was no evidence of negligence to go to the jury. The judgment is accordingly affirmed. All the judges concur.