EXPANSION REALTY COMPANY, Appellant, v. JACK GEREN, E. R. GEREN, W. D. PAYNE, GEORGE N. SPIVA, T. D. WILLIAMS, E. F. GOBAR, J. S. ROBERTS, CONQUEROR TRUST COMPANY and GEORGE S. LORD, Respondents.

Springfield Court of Appeals, November 14, 1914.

1. **MINES AND MINING: Leases: Evidence Reviewed: Accounting: Misrepresentations.** Suit for accounting by a corporation, owner of certain mineral lands. Evidence reviewed and examined and considered sufficient to show that it was induced to execute a mining lease on said land to defendants on an understanding that same would be assigned to a third party, that the consideration which said third party should pay would be divided between the owner, the corporation plaintiff and defendants and by a misrepresentation of defendant's agent as to the amount which the assignee was to pay.

2. ———: ———: **Oral: Letters Written Prior to Execution of Written Lease: Part of Agreement.** Where the owner of mineral lands, who had orally agreed to execute a mining lease thereon, before executing such lease wrote letters stating its understanding of the agreement, such letters were a part of the agreement.

3. **RES GESTAE: Evidence: Mines and Mining: Oral Agreement for Lease.** Where the owner of mineral lands who had made an oral agreement to lease such lands to parties who were to assign the lease and divide with the owner the consideration for the assignment, wrote certain letters stating its understanding of the oral agreement, such letters were a part of the *res gestae*.

4. **MINES AND MINING: Leases: Contracts: Repudiation in Part.** Under an agreement between the lessors and lessees that the mining lease should be assigned and the consideration .for such assignment should be divided between the lessor and lessees, the lessees are not entitled to accept the benefit of their contract and repudiate the obligations to the lessor thereunder.

5. ———: ———: **Principal and Agent: Trust Capacity.** The owners of mineral lands made an agreement with defendants' agent to lease certain land with an understanding that such agent should assign such lease to a third party, dividing the consideration therefor between the owners and defendants. The

agent was acting in a trust capacity to the owner and as its agent and was bound to exercise the utmost good faith.

6. **TRUSTS: Constructive Trusts: When Arise.** A constructive trust arises whenever one party has obtained money which does not equitably belong to him and which he cannot in good conscience retain or withhold from another who is beneficially entitled to it.

7. **MINES AND MINING: Leases: Forfeiture: Compromise: Settlement: When Binding.** Plaintiff claimed that defendants had forfeited their rights to a lease under a contract. As a compromise an agreement was made to execute to defendants a lease and contract which should be assigned to a third party and the consideration for such assignment should be divided between plaintiff and defendants. It was immaterial whether defendants really had forfeited their rights under the lease or not, because even a doubtful claim, asserted in good faith, is sufficient to support a compromise contract.

8. ————: ————: **Evidence Reviewed: Fraud in Procurement and Assignment.** Suit for accounting by corporation lessor against defendants, lessees. Evidence reviewed and examined. *Held*, that even though defendants were entitled to a lease of certain mineral lands under a contract, they were not entitled to assign it and that a fraud was perpetrated on the plaintiff both in procuring the lease and in an assignment thereof which was made.

9. **EQUITY: Jurisdiction: Accounting: Right To.** Where a bill charged fraud and asked for an accounting and sought equitable garnishment by impounding the fund alleged to be tainted with fraud, equitable jurisdiction was made.

10. **ACCOUNTING: Consideration: Return of: Fraud.** Where a party is induced by fraud to execute a lease which was to be assigned and by fraudulent representations is induced to accept a smaller share of the consideration for assignment than it otherwise would have accepted, it is not required to return the consideration which it did receive before bringing a suit for accounting, the assignee not having participated in the fraud.

11. **MINES AND MINING: Leases: Fraud: Assignment: Rights of Parties.** Where plaintiff was induced to execute a mining lease to defendants as a compromise and it was agreed that the same was to be assigned and the consideration paid by assignee for such assignment should be divided between plaintiffs and defendants and defendants misrepresented the amount which the assignee was to pay, the plaintiff was entitled to the excess over the amount represented less the expenses necessarily incurred by defendants in procuring and closing the transaction with the assignee.

12. APPELLATE PRACTICE: Court Rules: Abstract. Court rules 9, 12, 15, permit the evidence to be abstracted in narrative form. An appeal in a suit in equity will not be dismissed because a complete copy of the evidence was not printed in the abstract.

Appeal from Jasper County Circuit Court, Division Number Two.—*Hon. David E. Blair*, Judge.

DECREE FOR APPELLANT (*on condition.*)

*Shannon C. Douglass* and *McReynolds & Haliburton* for appellant.

(1) The two letters of November 14, 1912, in their relation to the issues in this case occupy the same position as any other two separate instruments or papers between the same parties and must be read and construed together as one instrument, in arriving at the intention and meaning of the writer in the transaction in issue, and the recitals or statements in one should be explained or limited by reference to the other. Sexton v. Anderson, 95 Mo. 373; Houck v. Frisbee, 66 Mo. App. 16; Jennings v. Todd, 112 Mo. 296; 9 Cyc. 581; Keogel v. Pessell, 91 Mich. 622; Miller v. Edgerton, 38 Kas. 36; Sewall v. Henry, 9 Ala. 24; Harriman v. Stowe, 57 Mo. 96; Brownwell v. Pacific R. R. Co., 47 Mo. 239; Stoeckman v. Terra Haute R. R. Co., 15 Mo. App. 515; Cunningham v. Parks, 97 Mass. 176; Rogers v. Manhattan Life Ins. Co., 138 Cal. 285; 2 Starkie on Evidence, 241; 1 Philips on Evidence, (4 Am. Ed.) 185; Thayer v. Burchard, 99 Mass. 517. (2) When Spiva, for himself and co-respondents, accepted the terms of the Douglass letter of November 14, 1912, (attached to and made part of the escrow papers deposited with the Trust Company to satisfy Lord of his (Spiva's) ability to procure or furnish the lease), he must necessarily accept the same, subject to the terms of the other accompanying Douglass letter of same date to him and enclosed in same envelope, for the two must be read

together as parts of one and the same transaction; and, when he received such letters and availed himself of the benefits of one of them as stated, the law steps in and *makes him liable for all the obligations of the other.* Tureman v. Stephens, 83 Mo. 218; Jarrett v. Morton, 44 Mo. 275; Sachleben v. Heinze, 117 Mo. 520; Austin v. Loring, 63 Mo. 19; Spurlock v. Sproule, 74 Mo. 63; Acton v. Dooley, 74 Mo. 63; Blodgett v. Perry, 97 Mo. 263. (3) Where one is either directly or constructively the agent or trustee of, or acting in any position of confidence, for another, the law requires of such person that he act honestly, and it will not permit him to speculate on, or to make any profits out of, a transaction in which his principal is interested, or as against his principal in any way. Reynolds v. Railroad, 114 Mo. App. 670; Philip v. Geiser Co., 129 Mo. App. 396; Hoppe v. Saylor, 53 Mo. App. 4; Murdock v. Milner, 84 Mo. 96; Kanada v. North, 14 Mo. 615; Smith v. Tyler, 57 Mo. App. 668; Bent v. Priest, 86 Mo. 475; Story on Agency, (8 Ed.), sec. 211; Perry on Trusts, sec. 206; Jacobus v. Munn, 37 N. J. Eq. 48. (4) The respondents, other than Lord and Conqueror Trust Company, by means of fraudulent representations and concealment, having received from the sale of the mining lease in question the sum of $5500 in excess of $6500, as represented to appellant prior to the execution of such lease, equity impresses upon such $5500 fund a constructive trust in favor of appellant, which is equitably entitled thereto, and respondents became and are trustees of such fund and are liable to account therefor to appellant. Pomeroy's Equity Jurisprudence (1905 Ed.) Par. 1044, 1047, 1053, 1058; Peack v. Maddox, 50 Mo. 256; Shaw v. Shaw, 86 Mo. 594; Baier v. Berberich, 6 Mo. App. 537; Cason v. Cason, 28 Mo. 47. (5) A court of equity has jurisdiction over an accounting, which is caused, or brought about, by reason of fraud or any other recognized branch of equitable jurisdiction; and where equity has once acquired jur-

isdiction of the subject-matter and the parties, it will do complete justice between them. Equity assumes jurisdiction over an accounting because of trusts, frauds, fiduciary relations, or other recognized heads of equitable jurisdiction (1 Cyc. 417); also to prevent multiplicity of suits (1 Cyc. 418). 1 Cyc. 427; Fowler v. Bentley, 135 Mo. App. 417; Wehrs v. Sullivan, 217 Mo. 167; School District v. Holt, 226 Mo. 406; Barnard v. Keathley, 230 Mo. 209.

*Walden & Andrews* and *Currey & Farris* for respondents.

(1) Douglass, speaking for the Expansion Company, and Spiva, entered into a contract at the office of the said Douglass in Kansas City on the 14th day of November, 1912. After Spiva left the office of the company and Kansas City, Douglass addressed a letter to Spiva, which was never answered, stating his, said Douglass, version of the contract, this letter, the appellant insists should be considered by this court in determining what the contract was between Spiva and Douglass. The letter is self-serving and should not be considered at all. Viele v. McLean, 200 N. Y. 260, 93 N. E. 468; Curtsinger v. McGowan, 149 S. W. 303, 304; Learned v. Tillotson, 97 N. Y. 1, 49 Am. 508; Talcott v. Harris, 93 N. Y. 567; Bank v. Delafield, 126 N. Y. 410, 27 N. E. 797; Gay v. Dairy Co., 162 N. Y. 388; Chicago v. McKechiney, 68 N. E. 954; Hammond v. Beeson, 112 Mo. 190, 201; Scott v. Haynes, 12 Mo. App. 597; Thomas v. Gage, 141 N. Y. 506, 36 N. E. 385; Gray v. Dairy Co. 162 N. Y. 388, 56 N. E. 903; Healey v. Malcolm, 78 N. Y. 1043; Dempsey v. Dubson, 174 Pa. 128, 34 Atl. 459. (2) The other letters mentioned in the appellant's argument are not admissible on the grounds of *res gestae*. 42 Am. & Eng. of 1 and 2 Ed. pp. 664, 665; Leahey v. Railroad, 97 Mo. 165, 172; Stevens v. Walpore, 76 Mo. App. 213, 220, 221; State v. Hudspeth,

150 Mo. 12, 27. (3) The appellant cannot recover on the theory of a constructive or implied trust, since: "A constructive trust is one that arises when a person, clothed with some fiduciary character, by fraud or otherwise gains some advantage to himself. 1 Perry Trusts, sec. 29. (4) There was no fiduciary relation between the plaintiff and defendant. 1 Perry on Trust, sec. 27; Wright v. Yates, 130 S. W. 1111, 1112; Jackson v. Cleveland, 15 Mich. 94; Lancaster v. Springer, 88 N. E. 272, 274; Stevenson v. Grapnell, 28 N. E. 379. (5) A voluntary conveyance from the plaintiff to the defendant cannot create a resulting or implied trust. Mayfield v. Forsythe, 45 N. E. 403, and Jackson v. Cleveland, 15 Mich. 94. (6) The evidence to raise a constructive or implied trust must be uncontradicted and clear and convincing. Allen v. Withrow, 110 U. S. 119; Austin v. Wilcoxen, 84 Pac. 417; Shaw v. Shaw, 86 Mo. 594; Johnson v. Qauilles, 46 Mo. 423; Hillman v. Allen, 145 Mo. 638.

STATEMENT.—The appellant, a corporation with its place of business in Kansas City, Missouri, owner of a fifteen-acre tract of mineral land in Jasper county, has filed a bill in equity charging that owing to certain fradulent representations made and relied upon by it, it was induced to execute a certain lease and the assignment of the same, and praying for an accounting to it by the defendants.

Summarized, the allegations of the bill are as follows: That on the ninth day of September, 1910, the plaintiff executed a contract with Jack Geren & Company, otherwise referred to in the evidence as the Quick Seven Mining Company but referred to throughout this opinion as Geren & Company, under the terms of which the latter was to get the right to prospect and search for zinc and lead ores, covering a period of four months from its date. That it provided that when certain things were done by Geren & Company a lease for

ten years, dated from the date of the contract, would be given by the plaintiff. That it provided that no assignment of the contract, or the lease contemplated thereunder, should be made without the written consent of the plaintiff. That said Geren & Company went into possession of the land, but failed to perform the conditions of the contract, and thereby forfeited any and all rights thereunder; and that at all times after the expiration of the four months, which was in January, 1911, plaintiff denied that Geren & Company had any rights under said contract or in the land. That Geren & Company claimed to have expended some $6000 in the development of the land; and that in order to effect a compromise of the claims of all parties to the contract the plaintiff expressed a willingness to divide the proceeds to be derived from a disposal of a lease, provided some reliable, responsible party could be found to take the lease and mine the ground; and that out of the proceeds procured from such disposal of a lease the defendants would be reimbursed for the amount they claimed to have expended on the property. That with that end in view Messrs. Williams, Gobar, Payne, Roberts, Jack Geren and E. R. Geren appointed the other member of Geren & Company, George N. Spiva, as their agent and attorney in fact to negotiate with a representative of the plaintiff for the purpose of making a mining lease of said land; that Spiva for Geren & Company, and Shannon C. Douglass for the plaintiff, entered into negotiations which finally resulted in the execution of a lease "as a new transaction" and by way of a compromise or adjustment of all differences and controversies between Geren & Company and the plaintiff. That said defendand Spiva represented to Douglass that one George S. Lord of Chicago was a responsible and capable person to work the ground, and that thereupon there was an explicit and distinct agreement reached by which plaintiff agreed that it would execute a lease direct to said

Lord, or to a corporation to be formed by him, or to said Spiva, with the understanding that if made to Spiva it would be at once assigned to said Lord or to a corporation that he would form. That Spiva further represented that $6500 was all that could be obtained from Lord for the lease. That at the request of said Spiva, acting for himself and his co-defendants, and on the representations made by him, plaintiff executed a lease dated November 20, 1912, to George N. Spiva, and inserted a provision therein that consent was given to an assignment to be made "to ————— corporation," but that no other assignment could be made without plaintiff's written consent; that said lease was so made to Spiva for the express purpose of carrying out the compromise between plaintiff and defendants, and that said lease was made for the use and benefit of George S. Lord or corporation to be formed by him, and not for the purpose of executing a lease under the terms of the contract of September 9, 1910, with Spiva and his co-defendants. That it was the agreement that out of the $6500, which it was represented Lord would pay for the lease, plaintiff was to receive $750, and that Spiva and his associates were to receive $5750 to renumerate them for the amount they claimed to have expended under the development contract. That the representation made by Spiva that $6500 was all that Lord would pay was false and fradulent and was made for the purpose of influencing plaintiff into executing a lease, and that relying upon such representation said lease was made, and that but for such representation the same would not have been executed. That Jack Geren, another defendant, made the same false representations to plaintiff's agent Douglass while the latter was in Jasper county on business relative to the contract. That only a short time before the filing of the bill plaintiff ascertained the fact to be that Spiva and his associates, other than Lord and the Conqueror Trust Company, had on Oc

tober 16, 1912, already made an option to purchase contract with Lord in which they were to receive $12,000 for a lease to be made to Lord or to a corporation to be formed by him. That said option to purchase contract, with an escrow paper, was turned over to defendant Conqueror Trust Company. That all of the said $12,000 has been paid except $2500. That at the time defendants were representing that $6500 was all that Lord would pay, they knew that they had executed an exclusive option to purchase contract calling for the payment of $12,000. That their representations were false and fradulent and made for the purpose of deceiving the plaintiff and after they knew that plaintiff had advised them that under no circumstances would it consent to make a lease or assignment of a lease for anything in excess of $6500 except upon a new agreement with respect to the sale and purchase price of said lease or assignment. That by reason of the procurement of the lease and assignment, as hereinbefore set forth, the co-defendants of Geren & Company received $5500 in excess of the amount they represented they were getting, and that all the defendants except Lord and the Conqueror Trust Company are insolvent, and that plaintiff is entitled to the $5500 so procured. Plaintiff asks that the Conqueror Trust Company and Lord be enjoined from paying out any part of the $5500 held by them by reason of the escrow agreement between Lord and Geren & Company, and that any of such sum in their hands be impounded and held subject to the orders of the court. The bill ends with a prayer for an accounting between plaintiff and defendants and for a judgment against the members of Geren & Company for the amount due plaintiff, and that Lord and the Conqueror Trust Company be enjoined from paying over to defendants any of the unpaid purchase price until ordered to do so by the court.

The answer of the defendants, except Lord and the Conqueror Trust Company, was a general denial. Lord's answer admitted that he purchased of Spiva a mining lease described in the petition but denied all other allegations in the bill, and denied that at the time of the institution of this suit he owed any of his co-defendants any sum of money whatever.

The evidence discloses that all the money had been paid by Lord to the Conqueror Trust Company for the other defendants and that all of it had been turned over to the defendants except the sum of $2521.

The evidence further shows that the Conqueror Trust Company figured in this transaction only for the purpose of holding the escrow agreement and acting as the party through whom the agreement would be carried out in detail by Geren & Company and Lord or his corporation.

Neither is there any evidence that Lord or the trust company were parties to the fraud charged to have been perpetrated on the plaintiff.

The vital question of fact to be determined in this case is as to what took place between Spiva and Douglass, the representatives of defendants and plaintiff, respectively, in the making of the lease and assignment thereof that went to Lord or his corporation for a consideration of $12,000, and this is to be determined largely from the versions of these witnesses as to what occurred during the negotiations and from the correspondence passing between them just prior to the making and delivery of the lease.

The facts stand admitted that for some time prior to the execution of the lease and the consent to the assignment thereof, there had been a controversy existing between plaintiff and Geren & Company as to the rights of the latter under the contract of September, 1910, under which contract Geren and Company were holding possession of the land. It is also admitted that

185MoApp29

Spiva and Douglass were empowered to adjust this controversy, and that certain correspondence passed between them, and that they had a meeting in the office of Douglass in Kansas City, Missouri, and there reached an understanding. It is admitted that Geren & Company did sell the lease to Lord or his corporation for $12,000, and that neither plaintiff nor its agent knew or had cause to know that Geren & Company was receiving or had received over $6500 until a short time before the institution of this suit.

As there is a direct conflict between the testimony of Douglass and that of Spiva as to what was agreed upon at the Kansas City conference, it is here fitting to review such correspondence as passed between them leading up to the conference in order to ascertain the positions taken and the attitude assumed by them in relation to this controversy they were meeting to make an adjustment of.

In a letter written by Douglass to Jack Geren on October 3, 1912, to which Spiva's attention was called by Douglass, it appears that the controversy as to the rights under the contract of September, 1910, was referred to, and in which Douglass said: "This is to again notify you to vacate at once," and in which Douglass told him that plaintiff would regulate the terms of any lease it would make and that none would be made recognizing any rights of Geren & Company in the property, and that any attempt to sell any alleged leasehold rights could not be carried out without the consent of plaintiff being obtained. This letter contained the following: "I will at any time confer with you or your representative in regard to a new deal, the full terms of which must be known and approved by my company, and its interest, financial and otherwise, will have to be respected. If a satisfactory adjustment is not had shortly, legal proceedings will be begun to recover the premises."

In all the letters leading up to the conference at Kansas City, Douglass in writing to Spiva recited that anything said by him was in furtherance of an amicable adjustment and not in any way recognizing any legal rights of Geren & Company.

On October 16, 1912, Spiva wrote to Douglass advising that he personally had invested about $800 in the development which had been done on the land by Geren & Company, and that he had a party who would put up a mill on the land if a lease could be had. He also stated in this letter: "I can get a mill started to building right away by people who have the money, to put the property to paying you royalty, possibly in the future give me a little of my money back, if they do not hear of any lease troubles."

This letter was answered by Douglass on October 17th in which answer this appears (speaking of Geren): "While not recognizing that he has any claim for a lease at this time, I have always felt disposed to concede something to him and associates as a compromise and simply to avoid litigation, necessary to recover the possession. There are certain things I desire to be specific about, as follows: 1. I must know all the terms and conditions of any proposed leasing, without reservation, and they must be satisfactory to my company. 2. Mill to be erected must fill the full requirements contemplated by the contract and lease to be made thereunder, and all other provisions to be strictly complied with. 3. The basis of the leasing, whether for money, property or otherwise, will have to be agreed to by said company. 4. The expansion Realty Company must share in the proceeds, to be derived from the leasing, upon the basis of part to Geren and associates and part to said company. I am disposed to suggest three-fifths to G. and two-fifths to the company, though an even division would not be inequitable in the least. 5. I am pleased that you have been selected to act as representative of your associates and I be-

lieve we can adjust all differences on a reasonably fair basis for all concerned. Geren has acted so badly that I prefer to have my conference dealings with others. It might be advisable for you to come here with full particulars as whatever may be done in this conection is relative to a new deal and must be so understood.''

Spiva answered this letter on the 18th in which he stated that defendants had shown their books to their attorney and shown that the amount expended by them in the development was $6164, and that their attorney advised them to demand a lease, and stated that the best thing that could happen to the defendants would be for them to make a demand for the lease ''and the company to fail to deliver it and keep us from making this deal which will not give us our money back if we put it through.'' Spiva then writes: ''Mr. Douglass, I am ashamed to tell you how little we get out of this deal if it is put through, and if two-fifths had to be given up there would be nothing worth my time in coming to your city to talk over.''

On the 19th Douglass wrote to Spiva calling attention to the failure of Geren & Company in doing their part under the contract of September, 1910, but that owing to the fact that Spiva and others had some money tied up in the development, he would consider a compromise, and suggested that Spiva come to Kansas City for a conference and submit ''their entire proposition in definite form so as to save unnecessary delay.''

On November 2d Douglass wrote to Spiva that he had seen Geren in Joplin and that a proposition had been talked over with Geren whereby a company would be formed to put a mill on this ground and that if a lease was made the parties putting the mill on would have fifty-one per cent interest in the lease and Geren & Company fort-nine percent interest in the lease, and that in this conversation Douglass had said to Geren

that plaintiff should have at least one-third interest in the forty-nine per cent, or, that Geren & Company should have the full forty-nine percent until enough royalties had been paid to pay them back their six thousand dollars and that then the stock should be turned over to the plaintiff to compensate it for the damage it claimed it suffered by reason of the failure of Geren & Company to work the ground. And in this letter Douglass said to Spiva: "I was disposed to agree with him on some adjustment of differences so that the parties who had advanced money to him would be protected if possible out of what should be realized from the assignment of a new lease when executed.

On November 5th Spiva acknowledged receipt of this letter of November 2d, in which he said, in speaking of the question of the lease: "I am not trying to make any money out of this deal and have not made a proposition to these people that would permit us to divide with you, just simply trying to get out of a bad hole, in doing which I could only do you the greatest service." And in this letter he also states that a division on the forty-nine per cent basis would not be acceptable.

On November 6th Douglass replied, saying: "You state your sole proposition is to be repaid the money advanced by Geren, etc. Now, if such is the case, and you and your associates are provided for as to your advancements, respectively, and Geren, son and Payne get three thousand dollars more out of whatever shall be realized from the assignment of the proposed lease, then why is it that you object to my company receiving the benefits thereafter accruing?"

On November 7th, Spiva replied: "I shall not consider staying in on this mining deal, but will take up the proposition of a cash consideration with these people if I am fortunate enough to be able to make this trade."

On November 12th, Spiva wrote to Douglass: "The time is drawing near when I will either have to do business with my people or let it go. Which shall it be? Let's you and I both get rid of our troubles by closing this thing up at once."

On November 13th, Douglass wrote to Spiva, saying: "Mutual concessions could accomplish great results, but they should be made in good faith and respect the rights of all concerned." .

On November 14th, Spiva arrived in Kansas City and reached an agreement with Douglass.

Douglass in his testimony relates the oral contract made on that day as being based on the statement by Spiva that $6500 was all that could be obtained for the lease and assignment, and that on such representation he (Douglass) agreed to accept for his company the sum of $750 and let Geren & Company have $5750 to reimburse them for their development outlay. But Douglass says that it was expressly stated by him that in case any other arrangement was made it would be necessary that they have a new deal all around, and that in case the purchaser or his corporation did not take the lease for the $6500, the lease prepared under the agreement of that date would not be considered as recognizing any rights of Geren & Company under the original contract. He also says that Spiva in that conversation asked him to write a letter, and that Spiva said: "Just state the fact that we can turn over the lease, but don't state anything about the amount of money to be paid, or anything of that kind, just state the fact of my right to turn over the lease to him." Douglass testified that he thereupon said to Spiva: "If I do that, I may write you another letter, explaining the matter between you and me. I don't know that it will be important to do it but I may do it."

Douglass testified that he did write such a letter on November 14th and sent it in the same envelope

with another letter written at the same time; that the one of these letters which Spiva requested was put up with the Conqueror Trust Company as one of the escrow agreement papers; that the other letter in the envelope, written on November 14th, was written for the purpose of avoiding any misunderstanding as to the scope of the oral agreement.

On November 19th, Spiva wrote to Douglass, stating that the deal with Lord was about finished. No specific mention was made of the two letters written by Douglass on November 14th.

On November 21st, Spiva telegraphed Douglass to make the lease to Spiva with privilege to transfer.

On that day Douglass wrote Spiva a letter enclosing the lease, and saying: "This lease is sent to you with the understanding and upon the condition that you remit $750, and that the assignment of the lease be made to the company you have in view, and if not, then the lease to be returned to me."

The deal was closed by Lord paying to Geren & Company $12,000 and receiving the lease with the assignment properly executed by Spiva, and by Spiva sending $750 to Douglass.

Spiva's version of the Kansas City conference is that he did not tell Douglass that they were getting $6500 for the lease, but supposed that Douglass gathered that idea from the amount he did tell Douglass they had already expended, some sixty-one hundred dollars and two or three hundred dollars in unpaid bills, and that the agreement reached was that the plaintiff was to get $750 in the adjustment of the controversy and for a lease and an assignment, and that Geren & Company were to have the balance.

In considering the correspondence it should be borne in mind that it is admitted that on October 16, 1912, the date of the first letter of Spiva to Douglass, Geren & Company by Spiva as their agent had given an exclusive option to purchase to Lord for the sum

of $12,000. This, of course, Spiva knew, and Douglass did not.

## OPINION.

FARRINGTON, J.—It will be remembered that on the evening of Novemeber 14, 1912, after Spiva had left the office of Douglass, two letters were written by Douglass to Spiva confirming their agreement adjusting the controversy between plaintiff and Geren & Company. Spiva admits receiving them, using the one that he had asked for along with the escrow agreement with Lord, and admits that he made no answer to either of these letters. He does not state why he did not answer them.

It could be possible that although plaintiff had all along, as the correspondence shows, contended that defendants had no rights under the contract of September, 1910, and that if any lease was made by it as a compromise it must know all the facts and the consideration to be received for the assignment, and still, on November 14, 1912, through its agent Douglass, have agreed to settle everything and make the lease and assignment for $750, having no concern in what defendants might get from Lord as compensation. But if the second letter of November 14th is any competent evidence of the agreement that was made, then Spiva's version must fail and Douglass be believed, as that letter confirmed the position the plaintiff was taking up to the time of the conference, as shown by the correspondence, confirms what Douglass testified took place at the conference, and confirms what Douglass testified he thought the deal was that he was making when he sent the lease to Spiva to be used only for a lease to Lord or his corporation, which lease was mailed on November 21st, a week after the letter was written.

The letter of November 14th accompanying the one that Spiva used in the trade with Lord is as follows:

"Mr. Geo. N. Spiva,
          "Joplin, Mo.
     "My dear Sir: I have prepared and herewith enclose a letter to you respecting the leasing of the east fifteen acres, and as a part of the transaction I write this letter to avoid any possible misunderstanding.

     "As stated to you today in my office, the Expansion Realty Company does not recognize any legal or equitable right on the part of Geren and his associates entitling them to a lease of this property, and hence, for the purposes of the present deal, this leasing will have to be considered a new transaction, and by way of a compromise adjustment of any and all differences or controversies between Geren and his associates and said company, to the end that when this lease is made upon satisfactory terms, the old Geren contract dated September 9, 1910, and all matters growing thereout, shall be considered as adjusted as between the parties in interest. To be explicit, it must be distinctly understood that in case the proposed leasing shall not for any reason be consummated, the negotiations relative thereto, and the execution of such lease, shall not in anywise be construed as an admission that Geren and his associates, or any of them, are entitled to a mining lease pursuant to said contract of September 9, 1910, or otherwise. You have stated to me that the Geren syndicate is to receive $6500 as compensation for turning over to the Chicago parties, or their representatives, a mining lease conveying said fifteen acres, and that no other consideration of any kind will accrue to said syndicate. I stated to you in our conference today that my company and myself should have at least $1000 out of the $6500, as partial compensation for the damage done to the

company by reason of Geren's delays and his withholding the possession of the property for nearly two years, and also by reason of the time and money necessarily expended by the company and myself in trying to adjust the differences between him and it. You offered a less sum, and we finally agreed upon $750, the same to be paid to me at the time of and as a part of the transaction in which the proposed lease shall be turned over to you, or to such person as shall be designated by you. As to the balance of the $6500, my company has no claim. If, however, a deal shall finally be made upon a different basis, then a different arrangement will have to be made between us.

"In order to obviate all possible misunderstanding between Mr. Geren and my company, I will expect the proper releases to be executed by Geren and his associates so that all alleged claims on his or their part arising out of said contract and matters growing out of the same, shall be fully and finally adjusted between them and my company; but in case the proposed leasing shall not be carried out, then nothing heretofore or hereafter said or done by me on the part of my company shall be construed as an admission by it or me to the effect that said Geren or his associates have any legal rights under said contract or otherwise. If you were the only person I had to deal with in this matter, I would not have taken the time to write this letter, but in view of the fact that you are representing others, I think it best to be explicit and thereby avoid any misunderstandings. If anything further occurs to me, I will write you again. Keep me advised of developments. With best wishes I remain,

"Yours truly,

"S. C. DOUGLASS."

The evidence, as we view it, is convincing that Douglass was misled by Spiva into executing this lease and assignment (and Spiva admits that Douglass did not know the consideration was $12,000) and that this information was withheld and misrepresented for the purpose of obtaining the lease and the assignment on better terms than they could have been acquired had the full facts been known to Douglass.

It must be borne in mind that Spiva, when he left the office of Douglass in Kansas City on November 14th, had no contract (whatever it was) that could have been enforced because it involved the leasing of land for a term of eight years and hence was within the Statute of Frauds; and the first time that he did have a contract that plaintiff could be held to an execution of the lease and assignment under was when on November 15th he received the letters written by Douglass the evening of the 14th.

This letter of November 14th explaining the deal to Spiva referred to the letter used by Spiva in the deal with Lord, and was, so far as plaintiff and defendants are concerned, a part of their agreement. [Sexton v. Anderson, 95 Mo. 373, 8 S. W. 564; Houck v. Frisbee, 66 Mo. App. 16; Jennings v. Todd, 118 Mo. 296, 24 S. W. 148; 9 Cyc. 581; Keagle v. Pessell, 91 Mich. 622, 52 N. W. 58.]

We agree with appellant that the letters of November 14th are each a part of the *res gestae* involving the lease negotiations beginning on October 16, 1912, when Spiva first wrote to Douglass, and continuing until the delivery of the lease on November 22d. [Corbett v. Railway Co., 26 Mo. App. 621; Harriman v. Stowe, 57 Mo. 96; Stoeckman v. Railroad, 15 Mo. App. 515; The Travelers' Ins. Co. v. Mosley, 8 Wall. 397, 19 L. Ed. 437; Cunningham v. Parks, 97 Mass. 172; Rogers v. Manhattan Life Ins. Co., 138 Cal. 285, 71 Pac. 348; Thayer v. Burchard, 99 Mass. 517.]

The use of one of these letters by Spiva and remaining silent as to the other is evidence corroborating the version of Douglass as to the fraud perpetrated on him. [DeBerry v. Wheeler, 128 Mo. 84, 30 S. W. 338; Acton v. Dooley, 74 Mo. 67.]

Defendants should not be permitted to accept the benefits of their contract and then repudiate the obligations they owe to the plaintiff. [Tureman v. Stephens, 83 Mo. 218.]

When Spiva and Douglass reached the agreement, which was a compromise of their differences, they then were acting together for the purpose of getting the consideration for the lease and assignment out of Lord or his corporation, and from November 14th on Spiva was acting in a trust capacity to plaintiff so far as carrying out the deal with the purchaser was concerned. Douglass was sending to Spiva the lease and the consent for an assignment thereof and Spiva was acting for both in getting, as Douglass understood it, $5750 for Geren & Company and $750 for plaintiff. He therefore was acting as the agent of the plaintiff so far as that transaction was involved and this relationship required the utmost good faith on his part.

In Perry on Trusts and Trustees (6 Ed.), Vol. 1, sec. 166, the rule is announced that if a person obtains the legal title to property by such arts or acts or circumstances of circumvention, imposition, or fraud, or if he obtains it by virtue of a confidential relation and influence under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, to hold and enjoy the beneficial interest of the property, courts of equity, in order to administer justice between the parties, will raise a trust by construction out of such circumstances or relations; and this trust they will fasten upon the conscience of the offending party, etc.

In Pomeroy's Equity Jurisprudence (3 Ed.), Vol. 3, sec. 1047, the law is thus declared: "By the well-

settled doctrines of equity, a constructive trust arises whenever one party has obtained money which does not equitably belong to him, and which he cannot in good conscience retain or withhold from another who is beneficially entitled to it; as, for example, when money has been paid by accident, mistake of fact, or fraud, or has been acquired through a breach of trust; or violation of fiduciary duty, and the like. It is true that the beneficial owner can often recover the money due to him by a legal action upon an implied assumpsit; but in many instances a resort to the equitable jurisdiction is proper and even necessary.''

It does not matter whether the plaintiff had a just cause to controvert the right of Geren & Company to a lease under the contract of September, 1910. The fact is undisputed that they were asserting that they had not forfeited their right to a lease thereunder, and even where a doubtful claim is asserted in good faith it will support a compromise contract. [Livingston v. Dugan, 20 Mo. 102; Hill v. Atoka Coal and Min. Co., 124 Mo. 153, 25 S. W. 926; 32 S. W. 111; Brownlow v. Wollard, 66 Mo. App. 636.]

On the other hand, suppose Geren & Company were entitled to a lease under the contract of September, 1910; they were not entitled to assign it without the written consent to do so from the plaintiff. The testimony of Douglass, corroborated by the letter of November 14th, clearly shows that the assignment was procured by a misrepresentation as to the amount the assignee was paying. A fraud, therefore, was perpetrated on the plaintiff not only in procuring the lease but in the assignment as well.

The bill charged fraud, asked for an accounting, and sought an equitable garnishment by impounding the fund supposed to be held by Lord and the Conqueror Trust Company. This makes equitable jurisdiction.

Plaintiff was not required to return the $750 which it received because it was not in position, so far as the assignee of the lease was concerned, to rescind the contract. Plaintiff had agreed to the making and assignment of the lease and the corporation taking it over had acted upon that agreement and had purchased and paid for rights under it.

As before stated, there is no charge nor any evidence that the assignee of the lease who paid $12,000 to Geren & Company owed any duty whatever to the plaintiff or was in any way connected with or aided Spiva and his associates in procuring the lease from the plaintiff.

Plaintiff was entitled under the contract as shown by the evidence to all the fruits derived from the assignment of the lease above $5750, less, in our judgment, any necessary expense paid out by Geren & Company in procuring and closing the transaction with Lord.

The bill was merely dismissed by the trial court, and the evidence is not sufficiently plain for this court to render a decree as to the full amount of the $5500 excess paid by the Lord company. There is some evidence of commissions and expenses paid out of the $12,000 received which did not go to Geren & Company and which in an accounting between the parties would be a proper item of adjustment. We are, however, convinced that plaintiff is entitled to the $2521 impounded and held at this time by the Conqueror Trust Company. Therefore, if within ten days from the date of the filing of this opinion the appellant shall file with the clerk of this court a written remittitur of all sums in excess of $2521, the amount now held by the Conqueror Trust Company, the decree of this court will be a judgment for that amount; otherwise, a decree will be entered reversing the judgment and remanding the cause for a new trial in accordance with the views herein expressed to the end that the

evidence may be made more definite and certain as to the commissions and expenses above referred to.

Respondents' motion asking that this appeal be dismissed because a complete copy of the evidence was not printed in the abstract is not well taken. Our rules 9 and 12 provide for the abstracting of the evidence both in equity and law cases. There was no dispute as to the admissibility or legal effect of any of the documents in this case that were abstracted. Whether, under the terms of the contract of September, 1910, the defendants were entitled to a lease is not a question on this appeal, the question being whether there was a bona-fide contention on the part of the plaintiff that under that contract they were not entitled to a lease. There is no doubt that a controversy had existed for a long time prior to the execution of the lease in which it was claimed by plaintiff that the defendants had no rights under the contract of September, 1910. This controversy and not the effect of the contract of September, 1910, made the consideration for the compromise agreement. Our rules 9 and 15 therefore contemplate the abstracting in the narrative form of testimony both in law and equity cases and rule 12 provides a remedy for the respondent where he is dissatisfied with the abstract presented by the appellant.

The order will stand as above indicated. *Robertson, P. J.,* and *Sturgis, J.,* concur.